UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JOHN YOST, | : | Case No. 3:12-cv-206 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| HENKELS & MCCOY, INC., | : | |
| Defendant. | : | |

**DECISION AND ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 20)**

This civil case is before the Court on the Motion for Summary Judgment (Doc. 20) filed by Defendant Henkels & McCoy, Inc. ("Defendant"). Plaintiff filed a Response in Opposition to Defendant's Motion. (Doc. 22). Defendant filed a reply memorandum. (Doc. 23). Defendant's Motion is now ripe.

### I.  FACTS

Defendant is an engineering and utility construction company that contracts with local and national utility companies to install, maintain, repair, and replace overhead and buried utilities, such as electric power lines, gas lines, water lines, sewer lines, and telephone and fiber optic cabling. (Doc. 20-4). In January 2010, Defendant began work on a three-year contract to perform services for AT&T in Dayton, Ohio (the "Dayton Project"). (*Id*.) In analyzing its staffing needs for the Dayton Project, Defendant determined that it needed three supervisory positions: an Area Supervisor; a Telecommunications Construction Supervisor in charge of the aerial work (the "Aerial

Work Supervisor"); and a Telecommunications Construction Supervisor in charge of the buried work (the "Buried Work Supervisor").  (*Id.*)

The Area Supervisor was responsible for overseeing the entire Project, including supervising the quality of both the aerial work and the buried work being performed, ensuring that safety guidelines were being followed, and addressing any customer concerns.  (*Id.*)  The Aerial Work Supervisor and Buried Work Supervisor were salaried, non-union positions and reported to the Area Supervisor.  (*Id.*)  The Aerial Work Supervisor was generally responsible for supervising construction crews that worked on installing, repairing, and maintaining above ground telecommunications cables and lines.  (*Id.*)  The Buried Work Supervisor was generally responsible for supervising construction crews that worked on installing, repairing, and maintaining underground telecommunications cables and lines.  (*Id.*)

On December 6, 2010, Defendant retained Robert Clem as an independent consultant to be the Aerial Work Supervisor.  (*Id.*)  On December 7, 2010, Defendant assigned Jerry Holley as the Area Supervisor.  (*Id.*)  On January 5, 2010, Defendant hired Plaintiff to be the Buried Work Supervisor.  (*Id.*)

In April 2010, Plaintiff sought treatment at the emergency department at Miami Valley Hospital in Dayton, Ohio, for an infection in his left great toe caused by his diabetes.  (Doc. 18-1, PAGEID 408; Doc. 15, PAGEID 100-101).  To treat that infection, Dr. Peter Ekeh performed several surgical procedures between April 20, 2010, and May 11, 2010, with the final procedure resulting in the amputation of Plaintiff's left leg below the knee.  (Doc. 15, PAGEID 102-103; Doc. 18, PAGEID 386-390; Doc. 18-1, PAGEID

2

408-413). Because Plaintiff had not been employed by Defendant for one year at that time, he was not eligible for leave under the Family Medical Leave Act ("FMLA"). Nevertheless, on May 13, 2010, Defendant granted him a medical leave of absence for his condition, with an expected return to work date of June 23, 2010. (Doc. 15, PAGEID 104-108). Plaintiff remained hospitalized until around May 25, 2010 when he was discharged to his home. (Doc. 15, PAGEID 108).

After Plaintiff was discharged from the hospital, he was restricted to working from home for four hours per day and from any standing activities. (Doc. 15, PAGEID 108-110). Plaintiff discussed these restrictions with Mark Maxwell, the Area Manager over the Dayton Project and Plaintiff's second-level supervisor. (Doc. 15, PAGEID 110). Defendant accommodated these restrictions and allowed Plaintiff to work a reduced schedule from home. (Doc. 15, PAGEID 109-111).

On or around June 23, 2010, Plaintiff provided Maxwell with a note from Dr. Ekeh indicating that Plaintiff could return to work for six hours per day. (Doc. 15, PAGEID 115-116). Defendant asked Plaintiff to have his doctor complete a Release to Return to Work, listing his essential job duties. (Doc. 15-1, PAGEID 233-234). Plaintiff provided the Release to Dr. Ekeh, who indicated on July 12, 2010, that, in addition to the restriction of only working up to six hours per day, Plaintiff had certain other restrictions in his ability to work and that he "must remain in [a] chair – no lifting, only sedentary work for at least the next 5 months" until December 2010. (Doc. 15-1, PAGEID 234). Under these restrictions, which remained in effect through the end of Plaintiff's employment with Defendant, Plaintiff was unable to perform the following tasks:

3

- Walking job-sites pre-construction to identify hazards, special needs and safety of the crew, the public and the customer;

- Lifting objects up to 20 pounds;

- Walking job sites during construction to visually inspect the crews and the progress of the construction; and,

- Performing safety and quality audits, which require walking, bending, stopping and/or squatting.

(Doc. 22-1, PAGEID 556).

On July 16, 2010, Plaintiff met with Maxwell to review his medical restrictions. (Doc. 15, PAGEID 127-129). During the meeting, Plaintiff agreed, in writing, that he could not perform certain tasks, including walking job sites, lifting objects, and performing safety and quality audits that required him to get out of his truck. (Doc. 15, PAGEID 130-134). Among other things, Plaintiff agreed to follow his doctor's medical restrictions, agreed to a revised job description based on his inability to perform certain tasks, and agreed that this was a temporary accommodation to be reviewed again in five months. (*Id.*) Defendant never asked or required Plaintiff to do anything that resulted in him not following his restrictions. (*Id.*)

On around July 22, 2010, Defendant provided Plaintiff with a letter memorializing the temporary employment arrangement that he discussed with Maxwell. (Doc. 15, PAGEID 136-138). Plaintiff signed that letter, acknowledging that he was returning to work "under a temporary arrangement in a different capacity since [he was] unable to perform all of the essential duties of a ***Telecommunications Construction Supervisor ("TCS")***" and that his doctor had restricted him from performing certain tasks. (Doc. 15-

4

1, PAGEID 239-240).  After entering into this agreement, Plaintiff returned to work for 30 hours per week pursuant to its terms.  (Doc. 15, PAGEID 136-138).

In June 2010, Holley resigned from the Company, leaving the Area Supervisor position on the Dayton Project open.  (Doc. 20-4).  After Holley resigned, the Company temporarily transferred Terry Shiverdecker, an Estimator from its Pataskala location, to be acting Area Supervisor until it could transition to a permanent replacement and to help with the buried work crews while Plaintiff's ability to work was limited.  (*Id.*)  The Company also brought in Jim Jameson, a Foreman from Chicago, to help with the buried work crews.  (*Id.*)  On July 2, 2010, the Company transferred Todd Taylor, who had been working at its Muncie, Indiana location, to permanently replace Holley as Area Supervisor.  (*Id.*)  While Taylor transitioned into that role, Shiverdecker continued to act as Area Supervisor.  (*Id.*)

Between July 2010 and September 2010, Defendant's revenues from the Dayton project declined sharply, and the Dayton Project was not generating the amount of work that Defendant initially projected.  (*Id.*)  As a result, Defendant made several staffing changes to the Dayton Project, including: terminating Jameson's temporary assignment; eliminating Plaintiff's position as the Buried Work Supervisor on September 23, 2010; eliminating the Aerial Work Supervisor position; and terminating Shiverdecker's temporary assignment as the acting Area Supervisor.  (*Id.*)  The Company completely eliminated all of the first-level supervisor positions and went from four supervisors on the project to one, with only Taylor remaining as the Area Supervisor.  (*Id.*)

After Plaintiff's position as the Buried Work Supervisor was eliminated, Barry Funk, an existing employee who was a Foreman and a union member, took over some of Plaintiff's job duties while also continuing to perform his own existing job duties. (Doc. 15, PAGEID 127-129; Doc. 17, PAGEID 328-329, 333, 351). However, as a union member, Funk did not take over several of Plaintiff's supervisory job functions, including the ability to discipline workers. (Doc. 17, PAGEID 360). Funk's title never changed to a supervisor position, and he was never paid as a supervisor. (*Id.*) Further, no one was hired or assigned as a Buried Work or Aerial Supervisor on the Dayton Project after Plaintiff's position was eliminated, and the Company ended the Project in July 2011 due to insufficient revenues, when nearly all of the remaining employees on the project were laid off. (Doc. 17, PAGEID 352; Doc. 20-4).

Plaintiff now brings this action against Defendant alleging that Defendant discriminated against him because of his disability when it terminated his employment. Plaintiff alleges that Defendant's actions violate the Americans with Disabilities Act ("ADA") and Ohio Rev. Code § 4112.02(A).

## II.  STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

6

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment - rather, all facts must be viewed in the light most favorable to the non-moving party." *Id*.

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading[.]" *Viergutz v. Lucent Technologies, Inc.*, 375 Fed. Appx. 482, 485 (6th Cir. 2010) (citation omitted). Instead, the party opposing summary judgment "must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial." *Id*. (citation omitted). In fact, Fed. R. Civ. P. 56(c) states that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the material cited do not establish the absence . . . of a genuine dispute[.]" Where "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Finally, "there is no duty imposed upon the trial court to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Buarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992) (citations omitted). Instead, "[i]t is the attorneys, not the judges, who have interviewed the witnesses and handled the physical exhibits; it is the attorneys, not the judges, who have been present at the

7

depositions; and it is the attorneys, not the judges, who have a professional and financial stake in case outcome." *Id*. at 406. In other words, "the free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not." *Id*.

### III. ANALYSIS

Defendant moves for summary judgment on all of Plaintiff's claims. The Court addresses Plaintiff's federal claim and state claim together because ADA claims are analyzed using "the same analysis for claims of disability discrimination under Ohio law." *Myers v. Cuyahoga County, Ohio*, 182 Fed.Appx. 510, 515 (6th Cir. 2006) (citing *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004)).

Under the ADA, no covered employer "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "[I]n the absence of direct evidence of disability discrimination, a plaintiff may seek to establish a prima facie case of discrimination." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999). Upon plaintiff satisfactorily demonstrating a prima facie case, "the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual." *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696 (6th Cir. 2008)).

8

Plaintiff can successfully demonstrate a prima facie case of disability discrimination by pointing to evidence:

> "that 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced."

*Whitfield*, 639 F.3d at 258-59 (citing *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357 (6th Cir. 2007); *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173 (6th Cir. 1996)). "When an employee is terminated as part of a reduction in force ("RIF"), [his] duty to present a prima facie case is somewhat heightened[,]" in that "the terminated employee must present 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Williams v. Emco Maier Corp.*, 212 F.Supp.2d 780, 783-84 (S.D. Ohio 2002) (citing *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510 (6th Cir. 1991); *Ridenour v. Lawson Co.*, 791 F.2d 52 (6th Cir. 1986); *Barnes v. GenCorp Inc.*, 896 F.2d 1457 (6th Cir. 1990); *cert. denied*, 498 U.S. 878 (1990)).

Here, Defendant argues that Plaintiff cannot demonstrate the second and fifth elements of a prima facie case, *i.e.*, that he was otherwise qualified for the position and that he was replaced. In addition, Defendant argues that Plaintiff cannot meet the heightened standard applicable in workforce reduction cases. Finally, Defendant argues that, even assuming Plaintiff could meet his burden of establishing a prima facie case of disability discrimination, his claims must fail because he cannot demonstrate the

9

Defendant's legitimate, non-discriminatory reason for Plaintiff's termination is pretext for unlawful discrimination.

The Court first addresses the fifth element because it is dispositive.[1] Defendant contends that Plaintiff was not replaced and that Defendant did not hold open Plaintiff's job after he was terminated in the reduction in force. Defendant points to evidence that Plaintiff's job duties were assigned to Barry Funk, which Funk performed in addition to the duties already required by the position he held at the time Plaintiff's job was eliminated. In this case, Plaintiff argues that the replacement element is satisfied because Barry Funk took over Plaintiff's duties after Plaintiff's termination. Plaintiff also contends that Funk was given a sixty-cent raise, some overtime and the job title of "technician" after assuming Plaintiff's former duties.

The Sixth Circuit holds that "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). Employees are "replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Id.* (citing *Sahadi v. Reynolds Chem.*, 636 F.2d 1116 (6th Cir. 1980)). A reassignment of an

---

[1] With regard to the second element, the ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds[.]" 42 U.S.C. § 12111(8). In determining the essential functions of a position, the finder of fact must consider "the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.*; *see also Keith v. County of Oakland*, 703 F.3d 918, 925 (6th Cir. 2013). "'[E]ssential functions' refer to job duties that are 'fundamental' rather than 'marginal.'" *Keith*, 703 F.3d at 925 (citing 29 C.F.R. § 1630.2(n)(1)). The Court assumes, without deciding the issue, that Plaintiff is qualified for the position for purposes of deciding this Motion because, generally, "[w]hether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Id.* at 926 (citing *Kiphart v. Saturn Corp.*, 251 F.3d 573, 581 (6th Cir.2001)).

existing employee or promoting a part-time employee to full-time status can establish the replacement requirement where the reassigned or promoted employee does not continue to perform his or her previous duties in addition to plaintiff's former duties. *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 522 (6th Cir. 1997).

Here, Plaintiff admits that,"[a]fter Plaintiff was laid off, Barry Funk performed both his own job duties and some of Plaintiff's former job duties." (Doc. 22-1, PAGEID 557; *see also* Doc. 17, PAGEID 328-329, 333, 351). In other words, this is the situation where Plaintiff was not replaced by Funk. Instead, a number of Plaintiff's former job duties were simply reassigned to Funk to perform in addition to the job duties Funk performed before Plaintiff's termination in the workforce reduction.

In addition, Plaintiff, in a work force reduction situation, "must meet a heightened standard to establish a prima facie case." *Geiger v. Tower Auto.*, 579 F.3d 614, 623-24 (6th Cir. 2009) (citation omitted). "A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company." *Id*. at 623. Again "[a]n employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge." *Id*. (citing *Barnes*, 896 F.3d at 1465). Generally, to meet this heightened standard, "the plaintiff must provide 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Id*. at 624 (citations omitted). Essentially, "the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff" on the basis of his disability. *Id*. (citation omitted).

11

Plaintiff does not point to any additional evidence tending to indicate that he was singled out because of his disability. Plaintiff argues, however, that his termination should not be construed as a workforce reduction because he was the only employee terminated. In support of his argument, Plaintiff cites *Bellaver v. Quanex Corp.*, 200 F.3d 485, 494-95 (7th Cir. 2000), in which the Seventh Circuit employed a "mini-RIF" analysis in a situation where only a single employee was terminated as part of the workforce reduction and "where the terminated employee's duties [were] absorbed by other employees not in the protected class."

Initially, the Court finds that Plaintiff's contention that he was the only employee terminated as part of the workforce reduction is factually incorrect. At the very least, in addition to eliminating Plaintiff's position as the Buried Work Supervisor, Defendant also eliminated the Aerial Work Supervisor Position, *i.e.*, contract employee Robert Clem. Plaintiff fails to demonstrate how Clem's status as a contract worker changes the analysis in this regard.

Even if the Court were to assume Plaintiff was the only employee terminated as part of the workforce reduction, the Court declines to follow the "mini-RIF" analysis set forth by the Seventh Circuit. As stated by another district court within the Sixth Circuit, "the mini-RIF rule has never been adopted in the Sixth Circuit or by any other Circuit Court of Appeals" and because "the Sixth Circuit has held that a reduction in force may occur where an employer eliminates only one position, which is at odds with the Seventh Circuit's mini-RIF approach." *Jones v. First Horizon Nat'l Corp.*, No. 09-2029-STA, 2010 WL 2364681 (W.D. Tenn. Jun. 9, 2010); *see also Geiger*, 579 F.3d at 623-24

(stating that "[a] work force reduction situation occurs when business considerations cause an employer to eliminate *one or more positions*"); *Lockett v. Marsh USA, Inc.*, 354 Fed. Appx. 984, 992 (6th Cir. 2009) (stating that "[e]liminating a single job is sufficient to constitute a legitimate reduction in force").  Accordingly, the Court concludes that Plaintiff fails to set forth a prima facie case of disability discrimination and that summary judgment in favor of Defendant is proper on that basis alone.

     Nevertheless, even assuming Plaintiff could establish a prima facie case of disability discrimination, his claims must fail because Defendant proffers a legitimate, non-discriminatory reason for Plaintiff's termination, *i.e.*, a reduction in force resulting from a lack of revenue on Plaintiff's project, and Plaintiff fails to demonstrate that the proffered reason is merely pretext for discrimination.  Plaintiff argues that pretext can be shown because: (1) the stated reason for his layoff has no basis in fact; (2) he was laid off just as he was about to return to work; and (3) Defendant has purportedly offered shifting reasons for his termination.

     "To establish pretext, a plaintiff must show that an employer's stated reason: (1) had no basis in fact; (2) did not actually motivate the challenged conduct; or (3) was insufficient to explain the challenged conduct."  *Simpson v. Vanderbilt Univ.*, 359 Fed. Appx. 562, 569-70 (6th Cir. 2009) (citation omitted).  To meet this burden, a plaintiff must present "'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.'"  *Id*. (citations omitted); *see also Chen v. Dow Chemical Co.*, 580 F.3d 394 (6th Cir. 2009) (stating that "summary judgment [in favor of the employer] is proper if, based

13

on the evidence presented, a jury could not reasonably doubt the employer's explanation"). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16 (1993).

First, Defendant argues the stated reason for his termination is not supported by the facts. In support of this argument, Plaintiff points to his own conclusory testimony that he "had all kind of work" at the time of his termination. Plaintiff also points to Funk's general statement that, after Plaintiff was laid off, he "kept work . . . all the way to the last day" and "actually turned work away." Funk admitted, however, that he had no information regarding Defendant's revenue on the project.

The Court concludes that Plaintiff's conclusory testimony and Funk's testimony fail to create a basis upon which a factfinder could reasonably doubt Defendant's proffered reason and infer a discriminatory animus. Outside of his own conclusory testimony and Funk's conclusory testimony, Plaintiff points to no other evidence concerning Defendant's financial status on the project in an effort to call into question Defendant's reason for terminating Plaintiff's position.

Second, Plaintiff suggests that the timing of his termination gives rise to an inference of pretext because he was terminated soon after his doctors cleared him to return to work full-time. The Court finds no merit to Plaintiff's argument in this regard because Plaintiff admits that he never informed Defendant before his termination that doctors cleared him to return to work full-time, and, even if he did, temporal proximity alone is generally insufficient to demonstrate pretext. *Joostberns v. United Parcel*

14

*Services, Inc.*, 166 Fed Appx. 783, 798 (6th Cir. 2006) (stating that "temporal proximity alone cannot create a genuine issue of material fact as to whether Defendant's proffered reason for termination was pretext, and that the actual motivation was disability discrimination").

Finally, Plaintiff suggests that Defendant has given shifting reasons for his termination and that these shifting reasons evidence pretext.  "'An employer's changing rationale for making an adverse employment decision can be evidence of pretext.'" *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579 (6th Cir. 2002).  In this regard, Plaintiff first contends that Defendant initially told him that it was terminating his employment because of "a lack of work," not because of low revenue on the AT&T project.  At least in the context of this case, the Court finds no distinguishable difference between a termination based on "a lack of work" and a termination based on "a lack of revenue."  In fact, Plaintiff admits that he was informed at some point that Defendant was encountering a lack of revenue on the project.  (Doc. 15, PAGEID 145).

Plaintiff also suggests that Defendant's argument that Plaintiff was not qualified for the position at the time of his termination is evidence of a shifting rationale for terminating Plaintiff.  However, there is no evidence in the record showing that Defendant ever advanced Plaintiff's physical inability to perform certain job functions as a rationale for terminating his employment.  In fact, the evidence demonstrates, without dispute, that Defendant worked with Plaintiff to modify his position so that Plaintiff could work an adapted work schedule until cleared to return to work full-time without limitations.  While Defendant, in moving for summary judgment, points to Plaintiff's

15

inability to perform the certain tasks associated with the Buried Work Supervisor position, such an argument is advanced solely in an effort to demonstrate that Plaintiff cannot satisfy a prima facie case of discrimination, not as a rationale for having terminated Plaintiff's employment.

Accordingly, the Court concludes that, even assuming Plaintiff could demonstrate a prima facie case of disability discrimination, he fails to show that Defendant's legitimate, nondiscriminatory reason for his termination was merely pretext for unlawful discrimination. Thus, having failed to demonstrate a prima facie case of disability discrimination, and, alternatively, having failed to demonstrate that Defendant's proffered reason for terminating his employment was pretext for discrimination, Plaintiff's disability discrimination claims cannot survive summary judgment.

## IV.  CONCLUSION

Based on all of the foregoing, there being no genuine dispute as to any material fact and movant being entitled to judgment as a matter of law, Defendant's Motion for Summary Judgment (Doc. 20) is **GRANTED**.  The Clerk shall enter judgment accordingly and terminate this case on the Court's docket.

**IT IS SO ORDERED.**

Date:  6/18/13                             *s/ Timothy S. Black*
                                                        Timothy S. Black
                                                        United States District Judge

16